ARCTIC CAT SALES INC., Petitioner

v.

STATE BOARD OF VEHICLE MAN-
UFACTURERS, DEALERS AND
SALESPERSONS, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 8, 2014.

Decided Feb. 23, 2015.

Robert B. Hoffman, Harrisburg, and Annamarie A. Daley, Minneapolis, MN, for petitioner.

Christopher K. McNally, Harrisburg, for respondent.

John G. Bergdoll, IV, York, for intervenor Neiman's Garage and Equipment, Inc.

BEFORE: BONNIE BRIGANCE LEADBETTER, Judge, ROBERT SIMPSON, Judge, and MARY HANNAH LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Arctic Cat Sales, Inc., a licensed vehicle distributor, petitions for review of an adjudication of the State Board of Vehicle Manufacturers, Dealers & Salespersons that disallowed Arctic Cat Sales' appointment of a new dealer to sell a variety of all terrain vehicles. In doing so, the Board upheld the protest of an existing dealer, Neiman's Garage & Equipment, Inc., to the appointment of Kennedy RV & Powersports, Inc., which is located approximately nine miles from Neiman. Arctic Cat Sales contends that Neiman did not meet its heavy burden of proving good cause not to allow its appointment of Kennedy as a dealer. Arctic Cat Sales also contends that Neiman lacked standing to protest Kennedy's appointment because Kennedy would sell products Neiman had never requested to sell in the past. Concluding that the Board erred, we reverse.

**Background**

Arctic Cat Sales is a licensed vehicle distributor that distributes a variety of products, including snowmobiles and all terrain vehicles (ATVs) manufactured by Arctic Cat, Inc. Central to this case are two Arctic Cat brands of ATVs with the product names "Prowler" and "Wildcat," which are known as "side-by-sides." Arctic Cat Sales' Brief at 3. Arctic Cat Sales describes a Prowler as a utility vehicle and the Wildcat as a sports vehicle, similar to a

dune buggy. Neither ATV is presently available from a dealer in York County.

Neiman, which is located in Dover, Pennsylvania, has been an authorized dealer of Arctic Cat products, including snowmobiles and ATVs, since 1983. It also services Arctic Cat ATVs. In March 2012, Neiman and Arctic Cat Sales executed the current franchise agreement that will expire in March 2015. In addition to ATVs, Neiman sells tractors and mowers for other manufacturers. Neiman also runs a repair business for automobiles, ATVs, tractors and mowers.

Kennedy, which is located in Dillsburg, Pennsylvania, is an authorized dealer of recreational vehicles, Arctic Cat snowmobiles and Kymco ATVs.[1] It does not sell Arctic Cat ATVs of any type. Under prior ownership, Kennedy did sell Arctic Cat ATVs, but in 2006 it surrendered its dealer franchise after Arctic Cat Sales appointed Bass Pro Shops, in Harrisburg, as a dealer of Arctic Cat ATVs.

In January 2014, Arctic Cat Sales notified Kennedy and Neiman that it intended to offer a full line of Arctic Cat products through both dealers. This meant that Neiman, which had previously refused to carry the Prowler and had not requested to sell the Wildcat, would be able to sell those ATV products. Likewise, Kennedy, which sold ATVs manufactured by Kymco, would also be able to sell the Prowler and Wildcat along with all other Arctic Cat ATVs. Neiman objected and requested Arctic Cat reconsider its decision, contending that the relevant market area could not support two dealers. Arctic Cat Sales refused, and Neiman filed a protest with the Board, which scheduled a hearing.

At the hearing, Neiman offered the testimony of its president, Ray E. Neiman, Jr., and John Bergdoll, Sr., who testified about Neiman's business reputation. Arctic Cat Sales presented the testimony of two of its employees, Adam August and Michael DiFonzo, and of Richard Ritter, one of the two owners of Kennedy.

The Board granted Neiman's protest. At the outset, the Board held that the Wildcat and Prowler products were ATVs and, thus, the Board had subject matter jurisdiction over Neiman's protest.[2] The

---

1. Some Arctic Cat ATVs are actually manufactured by Kymco.

2. In its initial brief to this Court, Arctic Cat Sales argued that Wildcats and Prowlers were not ATVs and, thus, the Board lacked jurisdiction to hear Neiman's protest with respect to those two products. An ATV is defined in Section 7702 of the Vehicle Code as:

> A motorized off-highway vehicle which travels on three or more off-highway tires and which has:
>
> (1) a maximum width of 50 inches and a maximum dry weight of 1,200 pounds; or
>
> (2) a width which exceeds 50 inches or a dry weight which exceeds 1,200 pounds.
>
> ATV's [sic] described in paragraph (1) may be referred to as Class I ATV's, and ATV's [sic] described in paragraph (2) may be referred to as Class II ATV's. *This term does not include* snowmobiles, trail bikes, motorboats, golf carts, aircraft, *dune buggies,*

automobiles, construction machines, trucks or *home utility machines;* military, fire, emergency and law enforcement vehicles; implements of husbandry; multipurpose agricultural vehicles; vehicles used by the department; or any vehicle that is or is required to be registered under Chapter 13 (relating to registration of vehicles). In addition, this term does not include off-road motor vehicles used exclusively as utility vehicles for agricultural or business operations and incidentally operated or moved upon the highway.

75 Pa.C.S. § 7702 (emphasis added). Noting that a "dune buggy" is not an ATV, Arctic Cat Sales contended Wildcats, which are designed for going on sand and soft soil, was a type of dune buggy. Noting a "home utility vehicle" is not an ATV, Arctic Cat Sales argued that the "Prowler" was not an ATV. In its reply brief, Arctic Cat Sales withdrew this jurisdictional argument.

Board rejected many of the claims in Neiman's protest. In Counts 1, 2, 4 and 5 of its protest, Neiman argued that Arctic Cat Sales' appointment of a new dealer would unreasonably change Neiman's responsibility. The Board rejected this contention because the franchise agreement did not grant Neiman an exclusive sales right. In Count 3, Neiman argued that Arctic Cat Sales had tried to coerce Neiman not to protest by threatening not to renew its franchise agreement in 2015, but the Board found no evidence of coercion. In Count 7, Neiman argued that Arctic Cat Sales did not give it sufficient notice of its intention to appoint a new dealer. The Board rejected this claim because Neiman did not demonstrate prejudice from the alleged defective notice.

However, the Board sustained Count 6 of Neiman's protest, holding that it proved good cause for not allowing the entry of a new vehicle dealer. Board Adjudication at 36; Reproduced Record at 256A (R.R. ——). Section 27(a), (c) of the Board of Vehicles Act[3] (hereinafter referred to as the Dealer Act) states as follows:

(a) Additional or relocation of new vehicle dealers.—

(1) *In the event that a manufacturer seeks to enter into a franchise establishing an additional new vehicle dealer* or relocating an existing new vehicle dealer within or into a relevant market area where the same line-make is then represented, the manufacturer *shall in writing first notify the board and each new vehicle dealer* in such line-make in the relevant market area of the intention to establish an additional dealer or to relocate an existing dealer within or into that market area. Within 20 days after the end of any appeal procedure provided by the manufacturer, any such new vehicle dealer may file with the board a protest to the establishing or relocating of the new vehicle dealer. *When such a protest is filed, the board shall inform the manufacturer that a timely protest has been filed,* and that the manufacturer shall not establish the proposed new vehicle dealer or relocate the new vehicle dealer until the board has held a hearing, nor thereafter, if the board has determined that there is good cause for not permitting the addition or relocation of such new vehicle dealer.

\* \* \*

(c) Board to consider existing circumstances.—*In determining whether good cause has been established for not entering into or relocating an additional new vehicle dealer for the same line-make, the board shall take into consideration the existing circumstances,* including, but not limited to:

(1) Permanency of the investment of both the existing and proposed new vehicle dealers.

(2) Growth or decline in population and new vehicle registrations in the relevant market area.

(3) Effect on the consuming public in the relevant market area.

(4) Whether it is injurious or beneficial to the public welfare for an additional new vehicle dealer to be established.

(5) Whether the new vehicle dealers of the same line-make in that relevant market area are providing adequate competition and convenient customer care for the vehicles of the line-make in the market area which shall include the adequacy of vehicle sales and service facilities, equipment, supply of ve-

---

**3.** Act of December 22, 1983, P.L. 306, *as amended,* 63 P.S. § 818.27(a), (c).

hicle parts and qualified service personnel.

(6) *Whether the establishment of an additional new vehicle dealer would increase competition and whether such increased competition would be in the public interest.*

(7) The effect the denial of relocation will have on a relocating dealer.

63 P.S. § 818.27(a), (c) (emphasis added). The Board found that Arctic Cat Sales' appointment of Kennedy did not satisfy the above-listed factors, particularly that which related to competition as set forth in subsection (c)(6) of Section 27.

Relevant to its holding, the Board made a number of factual findings. It found that Neiman had been an authorized dealer of Arctic Cat products, including both snowmobiles and ATVs, since 1983. During this time, it has also served as a service facility for Arctic Cat ATVs. Kennedy had been an authorized dealer of Arctic Cat ATVs, but it surrendered its franchise after Arctic Cat Sales appointed Bass Pro Shops in Harrisburg a dealer. Neiman and Kennedy are 9.2 miles apart, which places them in the same relevant market area. Bass Pro Shops is approximately 20 miles from Neiman and 17 miles from Kennedy. The Board found that in South Central Pennsylvania, which is rural and less densely populated, it is common for there to be more than one dealer within the statutory relevant market area of a ten mile radius. Nevertheless, the Board also found that given the proximity of Bass Pro Shops to both dealers, the relevant market area could not sustain both Neiman and Kennedy. Its critical finding on this point follows:

45. While there is likely to be a short-term price competition with the estab-

lishment of an additional dealer, in the long-term there is likely to be a financial failure or withdrawal from the ATV market of either [Neiman] or [Kennedy], or both, and thus resulting in less competition for Bass Pro in selling Arctic Cat products, as well as less competition between different line-makes of ATVs. (Hearing Transcript, page 18, line 16 to page 19, line 24; page 129 to page 130, line 15; page 131, lines 2–10).

Board Adjudication, Finding of Fact No. 45; R.R. 230A (citing Notes of Testimony, March 31, 2014, at 18–19, 129–30, 131 (N.T. ——); R.R. 33A–34A, 71A–72A, 73A).

The Board recognized that increased competition is good for consumers and that, generally, the appointment of an additional dealer to a relevant market area will increase competition. However, the Board concluded that the Dover–Dillsburg market area could not support two dealers of Arctic Cat products. One would fail, and Bass Pro Shops would be the beneficiary of the price war between Neiman and Kennedy, not the consuming public.[4] The Board reasoned as follows:

In the short-term [Arctic Cat's] addition of [Kennedy] as an additional dealer is likely to yield short-term benefits to consumers in the form of lower prices as the two dealers bid against one another to capture customers. There is uncontradicted testimony that previously consumers would shuttle back and forth between the two dealers with price quotes. While [Neiman] and [Arctic Cat Sales] disagree about the extent or frequency with which this bidding war would occur, neither party denies that it would. *History suggests that it would occur frequently enough and with*

---

4. The Board believed that the end of one or both dealerships would be injurious to consumers, a consideration under Section 27(c)(3) of the Dealer Act, 63 P.S. § 818.27(c)(3).

enough impact to force at least one dealer to surrender its franchise. The historical evidence from as recently as 2007 also demonstrates that this effect would be felt rather rapidly. The predecessor of [Kennedy] dropped its Arctic Cat franchise soon after Bass Pro entered the market.

Thus, the Board concludes that the addition of a new dealer in the relevant market area is likely to result in a rather intense, short-term price war between [Kennedy] and [Neiman]. The short-term benefit to consumers is obvious. In addition, [Arctic Cat] would experience the benefit of greater sales and market share, as well as an increase in customer loyalty created by small, local dealerships that rely heavily on personal customer service to compete with the substantial capital, name recognition and advertising budget of their nearest big box retailer.

The short-term mini-price war, however, would not come without cost. Plainly[,] the thinner profit margins of such a price war would affect all dealers, including Bass Pro. However, Bass Pro has more substantial capital and a broader range of products that it can rely upon to soften the impact of price competition in ATV sales with [Kennedy] and [Neiman], who will feel the effect more acutely. Again, *as recent history demonstrates, at least one of these two smaller dealers is likely to withdraw from the market.*

*But there is also the possibility that the toll of diminished profitability means that both [Kennedy] and [Neiman] could lose or surrender their Arctic Cat franchises, if not go out of business entirely. A price competition between these two dealers is likely to create consumer expectations of lower prices that will not disappear after one dealer has left the market. And the* last standing dealer in the Dillsburg–Dover market area will continue to compete with nearby Bass Pro. Thus, the introduction of two dealers into a small relevant market area, while yielding short-term price benefits to consumers, may in the longer term result in only one national chain dealer in the five counties of south central Pennsylvania.

*Therefore, the historical record supports the view that presently the relevant market in the Dover and Dillsburg area is large enough only to support one dealer, at most.* The evidence also supports the view that despite short-term price benefits to consumers, and the benefit of increased market share and customer loyalty to Arctic Cat built on the foundation of close, personal community ties of these two dealers to the customer base, there is a strong possibility that Bass Pro would be the last firm standing in the market to fully benefit from the investment and resources committed to the competition by [Kennedy] and [Neiman]. *In such a scenario, in the long-term more individual consumers would be done a disservice as they commit their spending and their product loyalty to the Arctic Cat brand and are left to bargain with only one national chain that is the only remaining Arctic Cat dealer in the five county area.*

*Clearly there is no smoking gun to support the conclusion that [Arctic Cat] has expressly adopted this scenario as part of its overall marketing strategy to gain greater market share. Nonetheless, the Board cannot rule out the possibility that it is, in fact, the strategy in play, or that it is not the most likely scenario to develop in the coming months and years if an additional dealer were to be established.*

Board Adjudication at 41–43; R.R. 261A–263A (emphasis added).

The Board held that Neiman met its burden of proving good cause for not permitting Kennedy to enter the relevant market area as a dealer of Arctic Cat products. Arctic Cat Sales petitioned for this Court's review.

 In its appeal, Arctic Cat Sales raises two issues. First, it argues that the Board's critical finding of fact on the long term harm to competition is not supported by substantial evidence. Second, Arctic Cat argues that even if Neiman established good cause to prohibit an additional dealer, this prohibition should not apply to the Wildcat or Prowler products because Neiman chose not to carry either the Prowler or the Wildcat.[5]

### Dealer Act Protest

As noted, the Dealer Act gives a vehicle dealer the right to notice and an opportunity to be heard whenever a vehicle manufacturer it represents decides to add a new dealer to its market area. Section 27(a)(1) of the Dealer Act, 63 P.S. § 818.27(a)(1). The "relevant market area" is defined as an area within ten miles of the existing franchise. Section 2 of the Dealer Act, 63 P.S. § 818.2.[6]

The Board's role in the dealer appointment process is limited. It does not have authority to give prior review and approval of a dealer appointment. It takes a protest in order for the Board to intervene in a new dealer appointment. Notably, the burden is on the protestant to establish "good cause" for not permitting the appointment of a new dealer. Section 27(c) of the Act, 63 P.S. § 818.27(c).

In *Krebs Chrysler–Plymouth, Inc. v. State Board of Vehicle Manufacturers, Dealers and Salespersons*, 655 A.2d 190 (Pa.Cmwlth.1995), this Court explained why the burden of proof is upon the protestant. In *Krebs*, two Chrysler–Plymouth dealers protested the appointment of a third dealer in the relevant area. The Board concluded that they failed to establish good cause for disapproving the appointment. On appeal, the dealers argued that substantial evidence did not support the factual findings of the Board. We found no merit to this argument. In rejecting their appeal, we held that it was "[the petitioners'] burden to establish the existence of good cause to deny the location." *Id.* at 193.

---

**5.** Our review determines whether constitutional rights were violated, an error of law committed, or if the findings of fact were not supported by substantial evidence. *Krebs Chrysler–Plymouth, Inc. v. State Board of Vehicle Manufacturers, Dealers and Salespersons*, 655 A.2d 190, 193 (Pa.Cmwlth.1995). Substantial evidence is defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Kerr v. Pennsylvania State Board of Dentistry*, 599 Pa. 107, 960 A.2d 427, 436 (2008). Circumstantial evidence "must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion so as to outweigh ... any other evidence and reasonable inferences therefrom which are inconsistent therewith." *Monaci v. State Horse Racing Commission*, 717 A.2d 612, 618 (Pa.Cmwlth.1998)

(quoting *Flagiello v. Crilly*, 409 Pa. 389, 187 A.2d 289, 290 (1963)).

**6.** Section 2 of the Dealer Act defines "relevant market area," in pertinent part, as follows:

(1) where a manufacturer is seeking to establish an additional new vehicle dealer, the relevant market area shall be in all instances the area within a radius of ten miles around the proposed site of the additional new vehicle dealer, except for cities of the first and second class which will be the area within a five-mile radius, around the proposed site of the additional new vehicle dealer[.]

63 P.S. § 818.2.

■ Neiman, an intervenor in this appeal, contends *Krebs* was wrongly decided. As explained by the Board, the Dealer Act requires the appointment of a new vehicle dealer unless "good cause has been established" to prohibit it. Section 27(c) of the Dealer Act, 63 P.S. 818.27(c). The Board describes "[t]he statute's verbal formula requiring a determination of good cause for *not* permitting the addition or relocation of a dealership [as] impl[ying] that there is *presumptively* good cause to add or relocate a dealership." Board Adjudication at 23; R.R. 243A (emphasis in original). As a matter of course, "the burden of proof must be placed upon the party challenging the proposition that enjoys the presumption of validity, *i.e.,* the protestant." *Id.* We agree.

Given the presumption that the appointment of a new dealer is valid, the burden must be on the party protesting the dealership appointment. Accordingly, we decline to revisit *Krebs.*

### Board Finding that Relevant Market Area Cannot Support Two Dealers

Arctic Cat Sales contends that the record lacks substantial evidence to support the Board's critical findings on competition. Specifically, it argues that the record lacks any evidence to support the Board's findings that: (1) the appointment of Kennedy would result in the financial failure of either or both Neiman and Kennedy; or (2) it was Arctic Cat Sales' intention to force the financial failure of Neiman and Kennedy in order to set up Bass Pro Shops as the exclusive dealer of Arctic Cat products in South Central Pennsylvania.

■ In support, Arctic Cat Sales observes that witness speculation cannot support an agency's findings. *See, e.g., City of Philadelphia v. Workers' Compensation Appeal Board (Kriebel),* 612 Pa. 6, 29 A.3d 762 (2011) (rejecting expert witness's spec-ulative testimony as incompetent); *Staub v. Unemployment Compensation Board of Review,* 673 A.2d 434, 437 (Pa.Cmwlth. 1996) (employee's beliefs fell in "the realm of speculation"). Phrases such as "a more likely scenario" and "[i]t is more reasonable to assume" strongly suggest that an agency's "findings are based on speculation and assumption, rather than substantial evidence in the record." *R.P. v. Department of Public Welfare,* 820 A.2d 882, 887 n. 16 (Pa.Cmwlth.2003).

Arctic Cat Sales notes that the Board's adjudication is replete with these phrases. For example, in the discussion part of its adjudication, the Board stated that "it *is likely* that there will be less competition for Bass Pro in selling Arctic Cat products;" that "one of these two smaller dealers *is likely* to withdraw from the market ... because of *the possibility* [of] the toll of diminished profitability;" and that "price competition between these two dealers *is likely* to create consumer expectations of lower prices." Board Adjudication at 28, 42; R.R. 248A, 262A (emphasis added).

The Board counters that its finding about future conditions in the relevant market area necessarily has to be expressed in terms of what is "likely." Its phraseology is simply irrelevant. The Board further notes that it made 61 findings of fact, and 60 of them relate to past events or present conditions. Only Finding of Fact No. 45 is predictive and is expressed in terms of what is likely to occur in the future. This is consistent with the Dealer Act, which requires the Board to make a prediction about future effects of a proposed establishment of an additional dealer in the relevant market area.

### A.

■ The central finding of fact challenged by Arctic Cat Sales is Finding of Fact No. 45, which states as follows:

While there *is likely to be* a short-term price competition with the establishment of an additional dealer, in the long-term *there is likely* to be a financial failure or withdrawal from the ATV market of either [Neiman] or [Kennedy], or both, and thus resulting in less competition for Bass Pro in selling Arctic Cat products. (Hearing Transcript, page 18, line 16 to page 19, line 24; page 129 to page 130, line 15; page 131, lines 2–10).

Board Adjudication, Finding of Fact No. 45; R.R. 230A (citing N.T. 18–19, 129–30, 131; R.R. 33A–34A, 71A–72A, 73A) (emphasis added). Arctic Cat Sales argues that none of the Board's record citations provide any support whatsoever for Finding of Fact No. 45.

The Board responds that Neiman's testimony suggested that relevant market conditions remained materially the same between 2003 when Bass Pro Shops entered the market and Kennedy left, and the date of the hearing in 2014. It further notes that Arctic Cat Sales did not present evidence that market conditions had changed in any material respect over the intervening years.[7] Information comparing market conditions in 2003 and 2014, had it been provided, may have caused the Board to conclude that the market could sustain two dealers.

We begin with a review of the evidence cited by the Board to support Finding of Fact No. 45. First, the Board cited pages 18 to 19 of the transcript, where there was testimony that the Bass Pro Shops store in Harrisburg has sold Arctic Cat ATVs since 2004, Prowlers since 2006, and Wildcats since 2011. *See* R.R. 33A–34A. Next, the Board cited pages 129 to 130 of the transcript, where one of the owners of Kennedy, Richard Ritter, stated that Kennedy has sold Kymco-brand ATVs for approximately three years. *See* R.R. 71A–72A. Finally, the Board cited page 131 of the transcript, where Ritter testified that he believed the prior owner of Kennedy stopped selling Arctic Cat ATVs "because of big box stores." R.R. 73A.

Arctic Cat Sales argues that the cited testimony, at best, established background facts. It does not support, directly or inferentially, the Board's factual finding that "there is likely to be a financial failure or withdrawal from the ATV market" of either Neiman or Kennedy or both. Board Adjudication, Finding of Fact No. 45; R.R. 230A. We agree. There is a disconnect between the record citations and Finding of Fact No. 45.

Critically, Ritter's "understanding" about why the prior owner of Kennedy stopped selling Arctic Cat ATVs is not based upon his own knowledge; it is double hearsay. Even accepting as true that Bass Pro Shop's entry into South Central Pennsylvania prompted Kennedy's prior owner to surrender its Arctic Cat dealership, there is no evidence that this business decision was a sound one. Apparently, the new owners of Kennedy are not daunted by the prospect of having to compete with Bass Pro Shops, which is located 17 miles away. After Ritter and his partner purchased Kennedy, the dealership introduced the Kymco ATV brand to the relevant market area to compete with ATVs carried by Neiman and Bass Pro Shops. Ritter also testified Kennedy would carry both the Kymco and the Arctic Cat lines of ATVs and other side-by-sides if its appointment by Arctic Cat

---

**7.** The Board concedes that Arctic Cat Sales did offer evidence that Neiman and Kennedy served different kinds of consumers, but argues that this evidence was not sufficiently detailed. It did not specify the numbers of those consumers, how much they may spend, or other relevant aspects of consumer behavior.

Sales is allowed to proceed. N.T. 141; R.R. 77a.

Simply, the record evidence cited by the Board does not support its prediction of ruinous competition that will result from Kennedy's appointment. There are already two dealers in the same market area selling ATVs. With Kennedy's appointment, the two existing dealers will be selling a wider selection of ATV products.

Neiman argues, however, that there is other evidence to support Finding of Fact No. 45. It believes a new dealership will lead to a bidding war and the financial failure of either or both Neiman and Kennedy. In support, it notes that witnesses for both Neiman and Kennedy acknowledged that ATV customers will compare prices between the two dealers. The Board described this as "testimony that previously consumers would shuttle back and forth between the two dealers with price quotes." Board Adjudication at 41; R.R. 261A. There was no evidence, however, that this form of competition had ever in the past devolved into a ruinous price war where dealers sold ATVs at losses that would cause their financial ruin.[8]

The Board argues that the absence of evidence that the market changed between 2003 and 2014 supports Finding of Fact No. 45. We disagree. First, evidence that the market was unchanged was not cited by the Board to support Finding of Fact No. 45. Second, it was not Arctic Cat's burden to establish that the market had changed since Bass Pro Shops' appointment in 2003. The burden was on Neiman to produce evidence on market conditions. Third, a market change would be relevant only if it had been proven that

when Kennedy surrendered its franchise for Arctic Cat ATVs, the relevant market area could not sustain two dealers. But this was never proven, leaving the issue of market change an interesting but irrelevant factual matter.

We conclude that Finding of Fact No. 45 is not supported by substantial evidence.

**B.**

■ Arctic Cat Sales also challenges the Board's assertion, presented in the discussion portion of its adjudication, that Arctic Cat Sales' real motive in the Kennedy appointment was to set up Bass Pro Shops as an exclusive dealer, i.e., "the last firm standing in the market to fully benefit from the investment and resources committed to the competition" between Kennedy and Neiman. Board Adjudication at 42; R.R. 262A. The Board reasoned that customers who developed a "loyalty to the Arctic Cat brand [would be] left to bargain with only one national chain." Id. at 43; R.R. 263A. The Board acknowledged that "there is no smoking gun to support [its] conclusion," but suggested "the possibility that it [was], in fact, the strategy" of Arctic Cat Sales in appointing Kennedy. Id.

Arctic Cat Sales contends that not only is there no "smoking gun" to support the Board's contrived scenario, there is no evidence at all. Even the Board's so-called "circumstantial evidence" is pure speculation. For example, the Board states it is "reasonable to infer that Bass Pro Shops is one of Arctic Cat's best customers." Id. The record contains zero evidence of Bass Pro Shops' sales, let alone its ranking among dealers. On the other hand, the record shows that Neiman and Kennedy

---

8. A "price war" occurs when retail price falls below that established by a manufacturer. See, e.g., Dairymen's Co-operative Sales Association v. McCreary, 132 Pa.Super. 524, 1 A.2d 508 (1938). Neiman did not argue that either dealer had ever priced products below dealer cost in order to ruin the other. At most, the testimony established that customers go from store to store to negotiate a lower price. This is called competition.

have been Arctic Cat dealers since the 1980s and that Arctic Cat Sales uses small dealers throughout the country. Regardless of where a customer purchases an ATV, that customer expects convenient servicing, which small dealers provide. Notably, not even Neiman theorized that Arctic Cat Sales' real purpose is to leave Bass Pro Shops as its exclusive dealer. Accordingly, it presented no evidence relevant to such a theory.

We agree with Arctic Cat Sales. There is no foundation in the record for the Board's conspiracy theory. It is not even logical.

Neither Neiman nor Kennedy requested to sell Wildcats until September 2013. Neiman testified he had been previously offered the Wildcat line but waited until the Wildcat Trail, a superior product, was introduced. N.T. 198–201. Had Arctic Cat Sales wanted to freeze Neiman out of the Wildcat market, as the Board speculated, it would not have offered Neiman the Wildcat line. Further, if Arctic Cat Sales had wanted to freeze both Neiman and Kennedy out of the Wildcat market, as the Board speculated, it would not have appointed both as dealers of all its ATV products.

In sum, the Board's conclusion that Arctic Cat Sales had an ulterior motive to cause both Neiman and Kennedy to fail is not supported by record evidence; was not argued by Neiman; and is not even a plausible business strategy.

**Conclusion**

We conclude that substantial evidence does not support the Board's finding that the appointment of Kennedy will lead to ruinous competition and leave Bass Pro Shops the exclusive dealer in South Central Pennsylvania to the detriment of the consuming public. There is a complete disconnect between the record citations of-

fered by the Board and Finding of Fact No. 45. Likewise, the record lacks an evidentiary foundation to support the Board's conclusion that Arctic Cat Sales' true strategy is to leave Bass Pro Shops "the last" dealer standing.

In a protest, the burden of proof falls "upon the party challenging the proposition that enjoys the *presumption* of validity, *i.e.*, the protestant." Board Adjudication at 23; R.R. 243A (emphasis in original). Neiman's evidence did not meet its evidentiary burden to overcome the presumed validity of Arctic Cat Sales' appointment of Kennedy.

Whether Kennedy's prior owner discontinued its franchise with Arctic Cat Sales because he believed it impossible to compete with Bass Pro Shops and Neiman is irrelevant. This is because the record contains no evidence that he was correct. Likewise, past customer negotiations on price that have occurred with Kennedy and Neiman does not support a finding that the relevant market area can sustain only one dealer. Whether there is one dealer or two in the relevant market area, Bass Pro Shops will continue to be a competitor, as will others. Likewise, Arctic Cat ATVs can be purchased on the internet from vendors all over the country through, for example, eBay.

The Board complained that Arctic Cat Sales did not present evidence that the relevant market area can support two dealerships. However, this was not Arctic Cat Sales' burden. Rather, it was Neiman's burden to prove that competition would be suppressed, not advanced, by Kennedy's appointment to sell Wildcats and other Arctic Cat products. Neiman did not offer a market analysis or statistical study that might support the inference that a price war and eventual failure of two dealerships would result from Arctic Cat Sales' appointment of Kennedy.

For these reasons, we reverse the Board's order.[9]

## ORDER

AND NOW, this 23rd day of February, 2015, the order of the State Board of Vehicle Manufacturers, Dealers and Salespersons, dated June 10, 2014, is hereby REVERSED.

DISSENTING OPINION BY Judge SIMPSON.

I respectfully dissent. For both standard-of-review and fairness reasons I would affirm the order of the State Board of Vehicle Manufacturers, Dealers & Salespersons (Board) which granted in part the protest of Neiman's Garage and Equipment, Inc. (Existing Dealer) and ordered Arctic Cat Sales, Inc. (Distributor) to *temporarily* withdraw the appointment of a new competing dealer for all-terrain vehicle (ATV) sales.

First, I disagree with the Majority over the Board's determination that the appointment of the new dealer could imperil competition in the market, which Existing Dealer currently shares with a "big box" retailer, Bass Pro Shops. It is undisputed that soon after Bass Pro Shops entered the market, another dealer dropped its ATV franchise with Distributor. From this historical record, the Board predicted that the establishment of an additional dealer now would mean that at least one dealer would leave the market.

As fact-finder, the Board is allowed to draw reasonable inferences from such circumstances. The Board's determinations are due deference, and our appellate review should afford the party prevailing before the Board every reasonable infer-

ence. By quibbling over the language used, by positing inferences other than the one drawn by the fact-finder, and by seeking inferences unfavorable to the prevailing party, the Majority strays from the appropriate standard of review.

Second, I am very concerned with what the Board viewed as a fairness issue. In its adjudication, the Board wrote:

> [Distributor] also offered evidence and argues that [Existing Dealer] was in violation of the franchise agreement. In support of this contention, [Distributor] noted that for several years [Existing Dealer] has not represented the Prowler product line. In addition, [Distributor] showed that [Existing Dealer] does not fully use co-op advertising funds that are available. [Existing Dealer] also appears to be confused about requirements versus recommendations for purchasing inventory on the floor plan, *and [Distributor] offered evidence that [Existing Dealer] is not one of its best performing dealerships.* See Respondent's Exhibit B.

\* \* \*

To the extent that [Distributor] considers [Existing Dealer's] performance to be deficient, the establishment of an additional dealership in the same relevant market area is certainly not [Distributor's] only option. *Indeed, the franchise agreement expires in March 2015 and, within the confines of the [Board of Vehicles Act[1] (BVA) ], [Distributor] may consider whether to extend [Existing Dealer's] franchise or not. The establishment of an additional dealer in a geographic market that may not be able to support two dealers is not*

---

9. Because we reverse as to the first issue, we need not address Arctic Cat Sales' second claim of error.

1. Act of December 22, 1983, P.L. 306, *as amended,* 63 P.S. §§ 818.1–818.37.

*an appropriate remedy for an existing dealership that underperforms.*

Bd. Op., 6/10/14, at 40–41, Reproduced Record (R.R.) at 260A–61A (emphasis added).

To explain the Board's statement about an inappropriate remedy, reference is made to Sections 13 and 27 of the BVA, 63 P.S. §§ 818.13, 818.27. Under the latter provision, which allows existing dealers to protest the addition of a new dealership in the relevant market area and which was operative in this case, the burden of proof is on the *existing dealer. Krebs Chrysler– Plymouth, Inc. v. State Bd. of Vehicle Mfrs., Dealers & Salespersons,* 655 A.2d 190 (Pa.Cmwlth.1995). In contrast, under the provisions applicable to the termination or failure to renew an existing franchise, the burden of proof is on the *distributor.* Section 13(e) of the BVA, 63 P.S. § 818.13(e).

I share the Board's concern that Distributor was using the addition of a new competing ATV franchise as a stealth squeeze on a small, underperforming existing dealer under more favorable administrative rules than would attach to a straightforward refusal to renew a franchise agreement. I also agree with the Board's June 2014 incremental decision, which resolved this "fairness" concern and took into consideration the limited time before Existing Dealer's franchise agreement was due for renewal in March 2015:

Therefore, the Board reasons that a more prudent, pro-consumer approach is to permit [Distributor's] appointment of [Existing Dealer] as a dealer of the Wildcat product, which would offer an incremental increase in consumer options and price competition. *In the remaining period of [Existing Dealer's] franchise agreement [Distributor] may evaluate [Existing Dealer's] performance, including its representation of the full Arctic Cat product line, as well as the changes in market share. At a future point the growth of Arctic Cat's brand may support a rational, data-driven change in the dealership network* in the five county South Central Pennsylvania region, *which may or may not include [new ATV dealer] or [Existing Dealer].* In consideration of [Existing Dealer's] substantial investment in the Arctic Cat franchise, its presence as a warranty service facility, and the opportunity for measured, incremental change to the dealership network that would promote greater long-term competition to benefit consumers, the Board determines that there is good cause not to permit the establishment of an additional Arctic Cat dealer in the ... market area at this time.

Bd. Op. at 44–45, R.R. at 264A–65A (emphasis added). Unfortunately, the Majority does not address the "fairness" issue or the Board's incremental approach at all.

In essence, the Board invited revisiting the matter in 10 months, when Existing Dealer's franchise agreement expires. In the meantime, the Board encouraged the parties to gather evidence of market share and dealer performance. I discern neither error of law nor abuse of discretion in this temporary, measured approach.

For both of these reasons, I respectfully dissent. I would affirm the Board.